UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JAMES OHLSON,

                 Plaintiff,

      v.

STATE OF WASHINGTON, et al.,

                 Defendants.

CASE NO. 3:22-CV-5864-JCC-DWC

REPORT AND RECOMMENDATION

Noting Date: June 10, 2024

The District Court has referred this matter filed pursuant to 42 U.S.C. § 1983 and Washington State law to United States Magistrate Judge David W. Christel. Before the Court for consideration is Defendants State of Washington, Washington State Department of Corrections, and Thomas Delong's Motion for Partial Summary Judgment on Plaintiff's § 1983 claims and his intentional infliction of emotional distress ("IIED") claim brought under Washington State law. Dkt. 25. After receiving supplemental briefing from both sides (Dkts. 35, 37, 40), the Motion is now ripe for consideration.[1]

---

[1] Plaintiff requested oral argument on the Motion. Dkt. 29. After consideration of the relevant record, the Court finds this matter can be decided without oral argument.

For the reasons set forth below, the undersigned recommends the Motion be granted and summary judgment be entered in favor of Defendants State of Washington, Washington State Department of Corrections, and Thomas Delong on Plaintiff's Eighth Amendment § 1983 claims and his IIED claim. It is further recommended Plaintiff's claims against unidentified "Doe" Defendants be dismissed. Finally, the undersigned recommends the District Court decline to exercise supplemental jurisdiction on Plaintiff's remaining state law claims and remand this matter to the Superior Court of Washington for Thurston County.

## I.    BACKGROUND

Plaintiff, an inmate currently incarcerated at Benton County Jail, filed this prisoner civil rights action following two incidents of restraint at the Close Observation Area ("COA") located on the medical floor of Clallam Bay Corrections Center ("CBCC").

### A. Complaint

In his Complaint, Plaintiff asserts Defendants, including several unnamed Defendants, violated his rights when an emergency response team ("ERT") used force to extract him from his cell after mental health staff ordered that Plaintiff's personal items be confiscated. Dkt. 1-1 at 3. Plaintiff alleges the ERT officers used an electronic immobilization device ("EID") shield to shock him and, after he stopped resisting, unnamed ERT officers applied cuffs to Plaintiff's wrists and ankles and laid on top of him until his clothes were cut off. *Id.* at 4. Plaintiff was then examined and returned to his cell without clothing or other personal items. *Id.* at 5. Shortly after he was returned to his cell, Plaintiff was observed removing a rubber seal around the inner window of his cell. *Id.* Then, a second ERT came to his cell, extracted him, and placed him in a restraining chair. *Id.* During the second extraction, Plaintiff states an unnamed ERT officer placed a spit mask over his mouth, which made it difficult for him to breath. *Id.* at 5. Plaintiff states he was in the restraining chair for two hours and thirty minutes. *Id.*

1   Plaintiff brings five claims for relief under federal and state law. His first two claims are

2   brought pursuant to 42 U.S.C. § 1983 and allege: (1) Defendants violated Plaintiff's Eighth

3   Amendment right to be free from cruel and unusual punishment by forcibly placing Plaintiff in

4   restraints, refusing to cover Plaintiff with a towel, forcibly putting a spit mask on Plaintiff, and

5   violating DOC policy related to restraining chairs; and (2) Defendants used unnecessary force by

6   forcing Plaintiff to the rear of his cell, shocking Plaintiff with the EID shield, and climbing on

7   top of Plaintiff when his clothes were being removed. Dkt. 1-1 at 5–7. Plaintiff also alleges

8   Defendants are liable under state law for (3) the intentional infliction of emotional distress; (4)

9   negligent supervision and training; and (5) general negligence. *Id.* at 7–9. As relief, Plaintiff

10  seeks compensatory damages. *Id*. at 9.

11  **B.  Procedural Background**

12  Plaintiff initially filed this action in the Superior Court of Washington for Thurston

13  County. Dkt. 1; *see also James Ohlson v. State of Washington, et al.*, Superior Court of Thurston

14  County, Case No. 22-2-02418-34 (filed Sept. 6, 2022). Defendants subsequently removed this

15  action to federal court, citing the issues of federal law raised in Plaintiff's § 1983 claims as the

16  basis for federal jurisdiction. Dkt. 1. Following the close of discovery, Defendants filed the

17  Motion seeking partial summary judgment on Plaintiff's § 1983 claims and his IIED claim only.

18  Dkt. 25.

19  Plaintiff responded to the Motion and, for the first time in that Response, argued

20  Defendants violated Plaintiff's Eighth Amendment rights to be free from sexual harassment. Dkt.

21  29. Based on the arguments raised in Plaintiff's Response and Defendants' Reply and in an

22  abundance of caution, the Court directed the parties to file supplemental briefing on the

23  purported sexual harassment claim. Dkt. 34.

24

1    However, after consideration of the entire record and, most importantly, the Complaint,

2    the Court finds Plaintiff has not alleged a sexual harassment claim.

3    Prisoner Eighth Amendment challenges generally fall into three broad categories: (1)

4    claims of deliberate indifference to serious medical needs of prisoners; (2) challenges to a

5    prisoner's conditions of confinement; and (3) claims that prison staffed used excessive force

6    against an inmate. *See Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020). The Ninth

7    Circuit assesses *sexual assault* claims under the same legal framework as an excessive force

8    claim. *Id*. Here, however, Plaintiff does not allege an excessive force claim because of any

9    alleged sexual assault or harassment. *See* Dkt. 1-1 at 6–7. Rather, the Complaint, which was

10   drafted by an attorney, clearly alleges an excessive use of force claim related to the activation

11   and use of an EID shield and prisoner staff laying on top of Plaintiff after he was cuffed and had

12   stopped resisting. *Id*. The Court Plaintiff does not allege that Defendants removed Plaintiff's

13   clothing or placed him in the restraint chair to sexually harass or assault him. *Id.*

14   Therefore, the Court concludes Plaintiff has alleged two claims under § 1983. First,

15   Plaintiff has alleged he was subjected to cruel and unusual punishment—thus, challenging the

16   conditions of his confinement—when Defendants placed Plaintiff in restraints, refused to cover

17   Plaintiff with a towel, forcibly put a spit mask over Plaintiff's face, and violated DOC policy

18   related to restraint chairs. *Id*. at 5–6. Second, Plaintiff has alleged Defendants violated the Eighth

19   Amendment when they used unnecessary force when they activated and shocked Plaintiff with

20   the EID shield and laid on top of Plaintiff after he stopped resisting. *Id.* at 6–7. The Court finds

21   no other § 1983 claim has been alleged in the Complaint.

22   In sum and notwithstanding its request for additional briefing, the Court does not find

23   Plaintiff adequately pled an Eighth Amendment sexual harassment claim. Therefore, any sexual

24

harassment claim—or claims not otherwise identified in the Complaint—should be dismissed as improperly raised for the first time in response to summary judgment. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (where allegations are not in the complaint, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court").

## II.    STANDARD OF REVIEW

Summary judgment is proper only if the pleadings, discovery, and disclosure materials on file, and any affidavits, show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## III.    SUMMARY OF THE EVIDENCE

The individuals involved in the two incidents of restraint at issue in this case are Defendant Thomas Delong, Corrections Officer Daniel Cumming, other unnamed corrections

1    officers, Associate Superintendent Lori Lawson, Psychology Associate Nancy Slover, and Nurse

2    Katherine Riojas. Dkt. 25-2 at 56–57. Each of these individuals is an employee of the

3    Washington State Department of Corrections ("DOC"), which owns and operates CBCC. The

4    following is a recitation of the general factual background. Additional facts will be discussed in

5    detail as relevant to each claim.

6    **A. Plaintiff's Placement in COA**

7        At DOC facilities, the COA is used to ensure the safety of inmates posing a risk to

8    themselves as well as those whose mental health disorders constitute a grave disability. *See* DOC

9    Policy No. 320.265, available at https://www.doc.wa.gov/information/policies/default.aspx (last

10   accessed April 30, 2024).[2] Plaintiff's conditions of confinement forms and his observation log

11   indicate he was committed to the COA on or around September 29, 2019, due to risk of suicide

12   and self-harm. Dkt. 25-2 at 5–7 (Conditions of Confinement Forms); Dkt. 25-2 at 9–52

13   (Observation Log). It is undisputed Plaintiff has borderline personality disorder and post-

14   traumatic stress disorder (PTSD) due to childhood sexual abuse. *See generally* Dkt. 30-3 at 22.

15       During his time in the COA, Plaintiff was placed in a bifurcated cell with a glass window

16   separating the inner and outer portions of the cell. *See* Dkt. 27,[3] sealed; Second Restraint Video

17   at 05:15–30. For the safety of individuals under observation, the COA cell was austere and fully

18   visible to an outside observer. *Id.* The inner portion of the cell was featureless, and the outer

19   portion was outfitted with a toilet and sink. *Id.* In terms of personal items, Plaintiff was permitted

20   a white shirt, socks, shorts, coveralls, a soft-cover book, a security blanket, and a security

---

22   [2] The contents of publicly available government policies are subject to judicial notice. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

23   [3] Docket Entry 27 memorializes the manual filing of a single USB exhibit under seal. Stored on that exhibit are three video files of incidents taking place in or around Plaintiff's COA cell on October 11, 2019. Hereinafter, the sealed video files will be referred to as "First Restraint Video I," "First Restraint Video II," and "Second Restraint Video."

mattress while in the COA. Dkt. 25-2 at 6–7 (Conditions of Confinement Forms). However, these "allowable in-cell items" could be removed if Plaintiff displayed an increased risk of self-harm. *Id.*; *see also* Dkt. 25-2 at 64 (Slover Deposition; testifying that Plaintiff was given additional personal items as his affect and behavior improved). In fact, after the incidents discussed below, many of the above listed personal items were removed as permitted items on Plaintiff's conditions of confinement form and he was instead limited to a white smock jumpsuit, a security blanket, and a security mattress with all bedding removed during daytime hours to prevent Plaintiff from using them to engage in self-harm. Dkt. 25-2 at 5 (Conditions of Confinement Forms).

### B. First Incident of Restraint

On the morning of October 11, 2019, security officers observed Plaintiff engaging in escalating behaviors, which included making obscene gestures, threatening staff, kicking his door, and urinating within the inner portion of his cell. Dkt. 25-2 at 57 (Incident Report); *see also* First Restraint Video I at 00:00–00:58, 11:02–11:06; Second Restraint Video at 02:35–02:45. Ms. Slover, the Psychology Associate at CBCC, determined these behaviors indicated Plaintiff was at increased risk for self-harm and recommended the removal of all personal items from his cell. Dkt. 25-2 at 62 (Slover Deposition). She then requested an emergency response be organized to remove all items from Plaintiff's cell.[4] Dkt. 25-2 at 56–57 (Incident Report); Dkt. 30-3 at 13 (Slover Deposition).

---

[4] Ms. Slover later testified she did not intend for Plaintiff's clothing to be removed from his cell and did not believe she requested he be stripped as the officer searched his cell. Dkt. 30-3 at 13 (Slover Deposition). Even so, the conditions of confinement forms, clearly indicate Plaintiff's clothing needed to be replaced with a white smock jumpsuit. Dkt. 25-2 at 5–7 (Conditions of Confinement Forms).

REPORT AND RECOMMENDATION - 7

Defendant Delong, the officer in charge of that response, assembled an ERT to be led by Officer Cumming and obtained permission from Superintendent Lawson to equip the ERT with an EID shield. Dkt. 25-3 at 56–57 (Incident Report); Dkt. 25-3 at 51–53 (Expert Report). Nurse Riojas cleared the use of the EID shield after verifying Plaintiff did not have any medical conditions that would place him at an increased risk of harm if the EID shield was activated during the emergency response. Dkt. 25-3 at 56–57 (Incident Report); Dkt. 25-3 at 51–53 (Expert Report).

Before initiating the response to Plaintiff's cell, Defendant Delong briefed the ERT:

> The team has been organized to go to [Plaintiff's] cell, make a show of force. I am going to order him to come to the door and cuff up. And, if he does so, we'll take his items that he has in the cell and whatever he is wearing and search his cell and put him back in the cell.
>
> If he refuses to come to the cell door, the team has been told the negotiation is over. They're gon—the team leader is going to take over. And, at that point, [the team] will control him and enter the cell and use whatever force is necessary to get him in the restraints. If that becomes necessary, they will pull him out and the nurse will take a look at him, and we'll, again, take all of his items and place him back in the cell.

First Restraint Video I at 01:01–02:00; *see also* Dkt. 25-2 at 57 (Incident Report).

Upon arrival to the cell, Defendant DeLong instructed Plaintiff to "come to the door and cuff up" at the open cuffing port. First Restraint Video I at 04:29–04:33. Plaintiff raised his hands in the air as he approached the door. *Id.* at 04:33–04:42. Defendant Delong then added "go ahead and strip out first." *Id.* at 04:42–04:44. After Defendant Delong repeated this instruction, Plaintiff stated he did not have any boxers and requested something to cover up with. *Id.* at 04:44–04:55. Defendant Delong told Plaintiff they would get him a privacy cover, but he needed to strip out first. *Id.* at 04:55–04:58. Plaintiff asked again for a privacy towel and did not comply with Defendant Delong's orders. Defendant Delong then instructed Officer Cumming to have the

ERT "take over" and said to Cumming "ok you're the team leader, you can go ahead and do what you need to do." *Id.* at 04:52–05:02.

As Officer Cumming and the ERT officers postured to enter the cell, Plaintiff stated he would cuff up. *Id.* at 05:05–05:13. He turned around, placed his hands in or near the cuffing port and continued requesting a privacy cover. *Id.* When Defendant Delong instructed Plaintiff to undress before being handcuffed, he removed his hands from the cuffing port area. *Id.* The ERT then began unlocking Plaintiff's cell door; Plaintiff turned his back to the door and held his hands behind his back, stating "I am not going to fight anybody. I am standing right here you can cuff me up. I've never fought you guys; I'm not going to. I just want something to cover up with." *Id.* 05:15–05:26.

Once the door was open, the ERT entered the cell. One of the ERT officers instructed Plaintiff to "get on the ground" while another officer used the EID shield to push Plaintiff to the rear of the cell. *Id.* at 05:26–05:31. Plaintiff was brought prone on the ground with the EID shield pressed over him. *Id.* at 05:31–05:33. As five ERT officers assisted in putting Plaintiff in handcuffs and ankle restraints, Defendant Delong informed Cumming that scissors were coming and said "cut his clothes off right here." *Id.* at 05:33–06:02. Plaintiff was kept in a secured prone position until another officer returned with scissors to remove his clothing. *Id.* 06:02–06:42.

After Plaintiff's clothing was fully removed, Officer Cumming told the officers restraining Plaintiff to slide a privacy towel under his body before picking him up off the ground. *Id.* at 08:26–08:33. In response, one of the officers stated they should wait until Plaintiff was standing and Officer Cumming agreed. *Id.* at 08:30–08:37. Upon hearing this plan, Plaintiff told the officers in the cell, "You've got to cover me up, man. I've had enough men staring at me naked to have my issues." *Id.* at 08:37–08:50 (expletives omitted).

1    The officers waited for a privacy towel to be brought to the cell before attempting to

2  stand Plaintiff up. *Id*. at 08:50–09:27 Once the towel was in hand, the officers assisted Plaintiff

3  to a seated position and told him several times to stand up on his own. *Id*. at 09:27–09:44. During

4  this time, Officer Cumming stood by holding the privacy towel in his hand. *Id.* Plaintiff did not

5  stand up on his own, so the officers lifted him to his feet and held him against the cell wall. *Id.* at

6  09:37–9:55.

7    Once Plaintiff was against the wall, Officer Cumming worked to wrap the privacy towel

8  around his waist. *Id.* at 09:59–10:16. As he was doing so, Defendant Delong can be heard off

9  camera saying, "hey Cumming, if he is resisting, don't worry about the privacy towel." *Id.*

10  Officer Cumming acknowledged Defendant DeLong's statement, continued his efforts, and was

11  eventually able to secure the privacy towel around Plaintiff's waist. *Id.*

12    As soon as the towel was secured, Officer Cumming directed the officers to escort

13  Plaintiff out of the cell. *Id.* at 10:16–10:18. Just a few moments later, however, the privacy towel

14  came loose and fell onto the floor. *Id.* at 10:20–10:41. The officers continued guiding Plaintiff

15  out of the cell to be examined by Nurse Riojas in an area cordoned off with white privacy

16  paneling. *Id.* at 10:40–11:10. Plaintiff was held upright by three officers during the nurse's

17  examination. *Id.* at 11:10–13:38.

18    While Plaintiff was being examined by the nurse, the other ERT officers searched

19  Plaintiff's cell for any items that could be used for self-harm. Dkt. 25-2 at 57 (Incident Report).

20  During the search, officers discovered a screw on the inner door frame had been loosened

21  approximately three-quarters of an inch. *Id.* This screw was considered dangerous contraband

22  and removed from the cell. *Id.*

23

24

After the nurse's examination and the cell search were complete, the ERT moved Plaintiff back into his cell and directed him to his knees, where his ankle restraints were removed. *Id.* at 13:38–14:40. The officers then closed the cell door, pulled Plaintiff's restrained hands through the cuffing port, and removed his handcuffs. *Id.* at 14:40–15:05. Once he was unrestrained but secured in his cell, Plaintiff began yelling which included threatening to kill the security officers' families. *Id.* at 15:05–16:02.

During the roughly 12-minute interaction with security officers (hereinafter "First Restraint"), Plaintiff complained he was being denied food. First Restraint Video I at 4:29–16:02. However, the Observation Log indicates he was offered food earlier that morning and he declined the meal. Dkt. 25-2 at 29 (entries from 7:24 to 7:24 a.m.).

Immediately after the First Restraint, Defendant DeLong discussed with Officer Cumming and, the ERT officers the use of force. *See* First Restraint Video II. During this discussion, Defendant Delong asked if the EID shield was activated; one of the ERT officers answered that the shield was activated and reported no injuries from this use of force. *Id.* at 01:20–01:36. Nurse Riojas was also present during this discussion and informed Defendant Delong that she was unable to obtain Plaintiff's blood pressure or confirm whether he was injured because he would not comply with a physical exam. *Id.* at 00:57–01:12.

## C.  Second Incident of Restraint

Roughly thirty minutes after the First Restraint, security officers noticed Plaintiff had removed several feet of window-seal caulking from his exterior door. *See, e.g.*, Dkt. 25-2 at 30 (Observation Log; entry at 1100), at 54 (Image of Caulking), and at 57 (Incident Report); Second Restraint Video, at 08:45–09:44. There is no dispute this caulking could be used to engage in self-harm. In response, an ERT—again led by Officer Cumming and supervised by Defendant Delong—was assembled. Dkt. 25-3 at 55 (Expert Report); Dkt. 25-2 at 30 (Observation Log;

entry at 11:03 a.m.) and at 57 (Incident Report). Although it is not captured on video, the

Observation Log and Incident Report indicate Plaintiff initially refused but ultimately complied

with being handcuffed at the door. Dkt. 25-2 at 30 (Observation Log; entry at 11:03 a.m.) and at

57 (Incident Report).

The ERT then entered the cell and removed Plaintiff, who was nude, without force and

began strapping him into restraining chair located in the hallway outside his door. Second

Restraint Video, at 00:00–05:08. White privacy screens can be seen on opposite sides of the

hallway while this is occurring. *See e.g.*, *id.* at 00:15, 07:25. Approximately two minutes into the

officers' efforts to secure Plaintiff in the restraining chair, a privacy towel was placed onto his

lap and straightened by Officer Cumming. *Id.* at 02:23–02:34.

Once Plaintiff was fully restrained in the chair, Defendant Delong directed the officers to

place him back in the cell, adding "make sure we take that towel, ok?" *Id.* at 05:08–05:15.

Plaintiff then made some comments including, "Oh yeah, make sure to really humiliate me." *Id.*

at 05:15–05:26.

Nurse Riojas then entered the cell and inspected the tightness of Plaintiff's restraints. *Id.*

at 05:32–05:38. After Plaintiff made a guttural noise, an ERT officer placed a spit mask over

Plaintiff's head. *Id.* at 05:38–07:00. Plaintiff wore the mask for less than two minutes and

shouted for much of that time. *Id.*

After the officers finished securing the restraining chair to the cell floor and the nurse

completed her inspection of his restraints, Plaintiff's spit mask and privacy towel were removed.

*Id.* at 07:01–07:10. It is undisputed Plaintiff was left unclothed in the restraining chair for two

and a half hours (hereinafter "Second Restraint").

1

## IV.    DISCUSSION

2      Plaintiff brings his § 1983 claims against the State of Washington, the DOC (a state

3  entity), and Defendant Delong (a state employee) in both his individual and official capacities.

4  Dkt. 1-1. To state a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) he suffered a

5  violation of rights protected by the Constitution or created by federal statute, and (2) the

6  violation was proximately caused by a "person" acting under color of state law. *See Crumpton v.*

7  *Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). When a claim is brought against an individual in

8  their official capacity, the real party in interest for that claim is the government entity for which

9  they work, not the individual named. In other words, "a suit against a state official in his official

10 capacity is no different from a suit against the State itself." *Doe v. Lawrence Livermore Nat.*

11 *Lab'y*, 131 F.3d 836, 839 (9th Cir. 1997) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58,

12 71 (1989)). And states are not "persons" that can be sued for damages under § 1983. *Doe*, 131

13 F.3d at 839. As a result, Plaintiff cannot sue the State of Washington, the DOC, or Defendant

14 Delong in his official capacity under § 1983. Therefore, the only viable § 1983 claims currently

15 before the Court are Plaintiff's claims against Defendant Delong in his individual capacity. As

16 such, the undersigned recommends summary judgment be granted in favor of Defendants on

17 Plaintiff's official capacity § 1983 claims.

18      As for his individual capacity § 1983 claims against Defendant Delong, Plaintiff argues

19 Defendant Delong violated the Eighth Amendment (A) by authorizing use of excessive force and

20 (B) by exhibiting deliberate indifference. Plaintiff also brings (C) an IIED claim under

21 Washington State law. Defendants argue none of Defendant Delong's conduct amounts to a

22 constitutional violation, nor does it make him liable on a state IIED claim. *See* Dkts. 25, 32, 35,

23 40. Alternatively, Defendants argue Defendant Delong is entitled to qualified immunity on

24

1    Plaintiff's excessive force claim and on his deliberate indifference claim. Dkts. 25, 35. The Court

2    addresses each of these claims and arguments in turn.

3    **A. Excessive Force Claim**

4    Plaintiff complains Defendant Delong authorized the use of excessive force during the

5    First and Second Restraint. Dkt. 29 at 9–10.

6    "When prison officials use excessive force against prisoners, they violate the inmates'

7    Eighth Amendment right to be free from cruel and unusual punishment." *Clement v. Gomez*, 298

8    F.3d 898, 903 (9th Cir. 2002). However, "[f]orce does not amount to a constitutional violation in

9    this respect if it is applied in a good faith effort to restore discipline and order and not

10   'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley v.*

11   *Albers,* 475 U.S. 312, 320–321 (1986)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010) (to

12   prevail on an excessive force claim, a plaintiff must allege "not only that the assault actually

13   occurred but also that it was carried out maliciously and sadistically rather than as part of a good-

14   faith effort to maintain or restore discipline").

15   The Court must consider the following relevant factors to determine whether the use of

16   force violates the Eighth Amendment: (1) "the threat [to the safety of staff and inmates]

17   'reasonably perceived by the responsible officials,'" (2) "the need for application of force," (3)

18   "the relationship between that need and the amount of force used," (4)"'any efforts to temper the

19   severity of a forceful response'" and (5) "the extent of injury suffered." *Hudson v. McMillian*,

20   503 U.S. 1, 7 (1992) (quoting *Whitley*, 475 U.S. at 322). The appropriateness of the use of force

21   is determined by the particular facts and circumstances of each case. *See Michenfleder v.*

22   *Summer*, 860 F.2d 328, 336 (9th Cir. 1988).

23   "This is not an easy test for [p]laintiffs to satisfy," as the Eighth Amendment does not

24   give federal courts license to enact broad prison reform, nor does it permit federal interference

with prison administration. *Hallett v. Morgan*, 296 F.3d 732, 745 (9th Cir. 2002). Because the use of force relates to the prison official's legitimate interest in maintaining security and order, the Court must be deferential when reviewing decisions regarding the use of force. *See Whitley*, 475 U.S. at 321–22.

Viewing the evidence in Plaintiff's favor, the Court finds he has failed to create a genuine issue of material fact to whether Defendant Delong authorized the excessive use of force during either restraint.

1. First Restraint

Defendants maintain the force used during the First Restraint was applied in good faith to restore order and discipline and argue Plaintiff has failed to create an issue of fact as to whether Defendant Delong authorized the use of excessive force maliciously and sadistically to cause harm. Dkt. 25 at Dkt. 25 at 8–11. The Court agrees with Defendants.

The Court first looks to any threat to the safety of Plaintiff or others that was reasonably perceived by Defendant Delong before the use of force. On this point, Defendants submit evidence showing Plaintiff exhibited an increased risk of self-harm through his disruptive behaviors (*i.e.*, kicking the door, threatening staff, and urinating within his cell) in the hours leading up to the First Restraint. *See* Dkt. 25-2 at 29 (Observation Log; entries 6:10 a.m. until 8:41 a.m.). Because of these behaviors, Ms. Slover directed security officers to remove all personal items from Plaintiff's cell to prevent him from engaging in self-harm. Dkt. 30-3 at 12–13 (Slover Deposition). Plaintiff does not submit conflicting evidence he exhibited an increased risk of self-harm.

Additionally, once the decision was made to enter Plaintiff's cell, Defendants submit evidence from their use of force expert showing there was a risk to the safety of officers who entered the cell. Dkt. 25-3 at 53–54 (Expert Report). Dr. Paparozzi explained risk of harm to

1    correctional officers is inherent to any cell extraction and, given Plaintiff's instability, refusal to

2    comply, and verbal aggression, the officers reasonably perceived a risk of harm to themselves

3    and to Plaintiff. *Id.* Also, testimony by Tomas Fithian, who is the Director of Security at DOC

4    and co-author of DOC use of force policies, confirmed risks to officer safety were inherent to

5    cell extractions. Dkt. 25-2 at 71–73 (Fithian Deposition); Dkt. 30-5 at 7, 10 (Fithian Deposition).

6    Thus, the evidence demonstrates it was necessary for Defendant Delong to reasonably perceive

7    risks of harm to Plaintiff and to the officers extracting him from his cell. As such, this first factor

8    weighs against a finding of excessive force by Defendant Delong.

9        The second factor considered is whether there was a need to use force when responding

10   to the risks of harm to Plaintiff and to the officers. Although correctional officers may never use

11   excessive force, they may use some measure of force when an inmate refuses a valid order or

12   prison rule. *Whitley*, 475 U.S. at 320; *LeMarie v. Maass*, 12 F.3d 1444, 1453–54 (9th Cir. 1993).

13   Consistent with this rule, the evidence shows Defendant Delong authorized the use of force only

14   after Plaintiff refused to comply with his directives. First Restraint Video I at 04:29–05:26.

15       While briefing the ERT about the plan for the emergency response to remove all items

16   from Plaintiff's cell, Defendant Delong stated Plaintiff would be given the opportunity to

17   voluntarily submit to handcuffs before the use of force would be authorized. First Restraint

18   Video I at 01:01–02:00. But if Plaintiff refused, Defendant Delong stated the "negotiation"

19   would be over and the officers would then "use whatever force is necessary to get [Plaintiff] in

20   the restraints." *Id.* Upon arrival to the cell, Defendant Delong directed Plaintiff come to the door

21   and "cuff up" and that Plaintiff must also remove his clothing. *Id.* at 04:29–05:26. Defendant

22   Delong repeated these orders and assured Plaintiff he would be provided a privacy cover after he

23   was restrained. *Id.* Plaintiff did not comply and stated he would not disrobe without a privacy

24

1   cover. *Id.* Defendant Delong directed Officer Cumming and the ERT to "take over." *Id.*  As the

2   ERT was in the process of entering the cell, Plaintiff stated he would submit to handcuffs but did

3   not state whether he would comply with the order to remove his clothing. *Id.* Thus, the Court

4   finds Defendant Delong was authorized to direct the use of some measure of force in the face of

5   Plaintiff's noncompliance. *LeMarie,* 12 F.3d at 1453–54 (collecting cases upholding the use of

6   tasers and other non-deadly force on disruptive, unruly, or recalcitrant prisoners to restore order,

7   discipline, and safety). Accordingly, this second factor also weighs against a finding of excessive

8   force by Defendant Delong.

9        For the third factor the Court looks to the relationship between the need to use force and

10  the amount of force used. Dr. Paparozzi explained it was essential for the officers to swiftly

11  establish control over the situation upon Defendant Delong's order to enter the cell. Dkt. 25-3 at

12  53 (Expert Report). He stated use of the EID shield to push Plaintiff to the rear of the cell was a

13  common and accepted method of establishing control. *Id.* 53–54. As for activation of the EID

14  shield, Dr. Paparozzi testified it is impossible to accurately discern how much or how little the

15  Plaintiff was resisting from watching the video and, based upon his review of officer statements

16  and other materials collected through DOC's internal investigation, the officers who entered

17  Plaintiff's cell reasonably determined activation of the EID shield was "necessary to gain

18  immediate control." Dkt. 25-3 at 54–55 (Expert Report). Dr. Paparozzi characterized Plaintiff's

19  posture as "static resistance" that could quickly escalate to "physically aggressive resistance." *Id.*

20  at 54.

21       Plaintiff argues there is a genuine issue of fact with respect to Defendant Delong and

22  references Director Fithian testimony that activation of the EID shield was improper under

23  DOC's use of force policy because, in his view, Plaintiff did not display active resistance after

24

1    the officers entered the cell. Dkt. 25-2 at 71–74 (Fithian Deposition). This evidence does not

2    create a triable issue as to Defendant Delong's liability for several reasons.

3         The Court first notes Director Fithian's opinion is related to the use of the EID shield in

4    relation to DOC policy, not the Eighth Amendment.[5] More significantly, Director Fithian's

5    opinion is related to Plaintiff's display of resistance after the officers entered his cell. Plaintiff

6    has not shown, nor does the Court find, Defendant Delong was involved in this application of

7    force. For example, the evidence does not show Defendant Delong was engaged in the use of the

8    EID shield. Plaintiff has not pointed to evidence Defendant Delong directed any of the ERT

9    officers to activate the EID shield without regard to active resistance by Plaintiff, nor has

10   Plaintiff identified evidence showing Defendant Delong knew the officers would shock Plaintiff

11   regardless of whether they believed he was resisting. *See Taylor v. List*, 880 F.2d 1040, 1045

12   (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if the

13   supervisor participated in or directed the violations, or knew of the violations and failed to act to

14   prevent them."). Finally, Director Fithian's opinion about Plaintiff's lack of active resistance was

15   based on his review of the video footage of the First Restraint. Dkt. 30-5 at 14–16 (Fithian

16   Deposition). As Dr. Paparozzi testified, one cannot rely on the video footage to discern how

17   much or how little Plaintiff was resisting; and, in his own Complaint, Plaintiff stated "he resisted

18   the officers for twenty-five seconds" after the entered the cell. Dkt. 1-1 at 4. Thus, Plaintiff has

19   failed to create a genuine issue of fact as to whether Defendant Delong is personally responsible

20   for any unjustified electronic shocks allegedly delivered by the ERT during the First Restraint.

21

22        _____

23        [5] The Ninth Circuit has explained that internal policies may be relevant to constitutional excessive force claims when those policies are intended to protect the individuals against whom force is used. *Scott v. Henrich* 39 F.3d 912, 916 (9th Cir. 1994). At this stage, the Court must take reasonable inferences in Plaintiff's favor. As such, the Court will assume internal policies and practices requiring officers to avoid or temper their use of force are

24   intended, at least in part, to protect prisoners from unnecessary pain and injury.

The Court next considers the fourth factor—whether any steps were taken to temper the severity of force. Relevant to this factor, Plaintiff submits evidence suggesting Defendant Delong did not take sufficient steps to avoid the use of force. Director Fithian testified Defendant Delong had an opportunity to avoid the use of force by placing Plaintiff in handcuffs before ordering the officers to extract him from the cell. Dkt. 30-5 at 7, 10, 11–13 (Fithian Deposition). DOC Investigator John Padilla also testified his "personal feeling" was Defendant Delong had an opportunity to avoid force. Dkt. 30-2 at 10 (Padilla Deposition).

Viewing the incident as a whole, the evidence shows Defendant Delong took steps to temper the severity of the force used. After Defendant Delong was directed to remove all personal items from Plaintiff's cell, he prepared an extraction team and first attempted to use no force to extract Plaintiff. Dkt. 25-3 at 56–57 (Incident Report); First Restraint Video I at 04:29–05:10. Before turning over the extraction procedures to Officer Cumming and the ERT, Defendant Delong directed Plaintiff to cuff up and disrobe several times—at no point did Plaintiff fully comply with these orders. *Id.* at 04:52–05:33. And, prior to engaging with Plaintiff, Defendant Delong received approval to use an EID shield and took precautions to ensure the EID shield, if activated, would not place Plaintiff at risk of serious harm. Dkt. 25-3 at 56–57 (Incident Report); Dkt. 25-3 at 53 (Expert Report). And, as Dr. Paparozzi explained, the EID shield was selected as a less harmful alternative to a chemical spray. Dkt. 25-3 at 53 (Expert Report). Moreover, Director Fithian concluded that use of the inactive EID shield to enter the cell was appropriate, Dkt. 25-2 at 72–43 (Fithian Deposition), and Investigator Padilla stated he was unsure whether the use of force was excessive, Dkt. 30-2 at 11 (Padilla Deposition). Thus, even viewing the evidence in Plaintiff's favor, the fourth factor weighs against—or, at most, neutrally upon—a finding of excessive force by Defendant Delong.

1    The fifth and final factor is the extent of injury suffered by Plaintiff. On this point, the

2    Supreme Court has clarified a plaintiff's *de minimis* injury is relevant to an excessive force claim

3    only insofar as it sheds light on the amount of force applied. *Wilkins*, 559 U.S. at 37–38. Here,

4    Defendants correctly argue Plaintiff submitted no evidence of significant injury. Dkt. 25 at 8;

5    Dkt. 32 at 5–6. In his declaration, Plaintiff states he was shocked multiple times by the EID

6    shield yet, other than stating he experienced pain, he does not identify any physical injuries from

7    the shocks. Dkt. 31 at 3, 5 (Ohlson Declaration, ¶¶ 12, 20). However, as the Supreme Court

8    recognized in *Wilkins*, the absence of evidence showing significant injury is likely to impact the

9    sum of damages available at trial, but it does not preclude a finding of excessive force. *See*

10   *Wilkins*, 559 U.S. at 40 ("[T]he relatively modest nature of [a prisoner's] alleged injuries will no

11   doubt limit the damages he may recover."). Thus, this final factor weighs neither in favor of not

12   against a finding of excessive force.

13   After reviewing the evidence under the relevant factors, the undersigned finds Plaintiff

14   has failed to create a genuine issue of material fact as to whether Defendant Delong authorized

15   the use of excessive force maliciously and sadistically to cause harm. Accordingly, the

16   undersigned recommends summary judgment be granted in favor of Defendant Delong on

17   Plaintiff's excessive force claim based on the First Restraint.

18   2.   Second Restraint

19   Regarding the Second Restraint, Defendants argue use of the restraining chair was a

20   reasonable response to Plaintiff's increased risk of self-harm and Plaintiff has failed to show this

21   force was nontrivial and applied maliciously and sadistically to cause harm. Dkt. 25 at 8–11. The

22   Court agrees.

23   "[P]lacement in a restraint chair does not in and of itself constitute an excessive use of

24   force, as the use of devices such as restraint chairs or 4-point bed restraints have repeatedly been

1  found to be constitutional when used appropriately." *Singleton v. Brown*, No. 9:15-cv-2723-

2  JMC-BM, 2016 WL 11200707, at *15 (D.S.C. Sept. 14, 2016), *report and recommendation*

3  *adopted*, 2017 WL 942177 (D.S.C. Mar. 10, 2017), *aff'd*, 714 F. App'x 307 (4th Cir. 2018)

4  (collecting cases). However, an excessive force claim may lie where restraining devices are used

5  without justification or in a manner causing unnecessary pain and suffering. *Parker v. ED*, No.

6  3:23-cv-00137-MMD-CSD, 2023 WL 8377645, at *4 (D. Nev. June 1, 2023) (prisoner plausibly

7  alleged excessive force claim based on allegations they were placed in restraining chair with

8  straps tight enough to draw blood).

9      Two cases involving the use of restraining devices are instructive here.

10     In *Young v. Martin*, the Third Circuit concluded a genuine issue of material fact existed

11  as to whether officials used excessive force when they strapped a prisoner to a restraining chair

12  for fourteen hours even though he did not pose a risk of harm to himself or others, 801 F.3d 172

13  (3d Cir. 2015). To reach this conclusion, the Third Circuit examined the restraint using criteria

14  put forth in the Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 730 (2002):

15      As applied to mechanical restraints, the Supreme Court in *Hope* identified
16      particular criteria relevant to the use of excessive force test, holding that (1) where
        the inmate had "already been subdued, handcuffed, [and] placed in leg irons," and
17      (2) there was a "clear lack of an emergency situation" such that "[a]ny safety
        concerns had long since abated," then (3) subjecting the inmate to "substantial risk
18      of physical harm" and "unnecessary pain" serves no penological justification.

19  *Young*, 801 F.3d at 180 (quoting *Hope*, 536 U.S. at 738).

20      On the first point, the prisoner was searched, secured, and placed in wrist and ankle

21  restraints immediately prior to being placed in the restraining chair. *Young*, at 181. Thus, the

22  Third Circuit concluded reasonable minds could differ as to whether the prisoner continued to

23  pose a risk of danger to himself or others at the time he was restrained. *Id.*

24

1    On the second point, the Third Circuit concluded a reasonably jury could find there was

2 no emergency and that any risk of harm had "long since abated" by the time the prisoner was

3 restrained. *Id.* At no point leading up to the restraint had the prisoner displayed violent,

4 combative, or self-destructive behaviors. *Id.* Rather, the prisoner merely exited his cell after an

5 officer inadvertently left his cell door open. *Id.* After he was discovered, he complied with

6 officers' instructions and did not resist as officers removed him from the common area and

7 subjected him to a strip search. *Id.*

8    On the final point, the Third Circuit found a "dispute of fact as to whether, despite the

9 lack of an emergency situation and the evidence that [the prisoner] was already subdued, the

10 prison officials exposed [him] to a 'substantial risk of physical harm' and 'unnecessary pain' by

11 placing him in the restraint chair." *Id.* (quoting *Hope*, 536 U.S. at 738). The prisoner was left in

12 the restraining chair for an excessive amount of time and nearly twice the duration permitted by

13 applicable policies. *Id.* at 181–82. The Circuit Court described the lengthy restraint as "extreme,"

14 explaining that, from the very beginning, the prisoner cried out in pain about the restraints and

15 his naked body and genitals were exposed to cold air blowing from a nearby air conditioner for

16 the duration of his restraint. *Id.* at 182. By the time he was released, the prisoner was shaking

17 uncontrollably, his legs were numb, and he was unable to hold his own weight. *Id.*

18    Based on these three criteria, the *Young* Court concluded a reasonably jury could find

19 force was applied maliciously and without penological justification. *Id.* at 180–83.

20    By comparison, in *Troupe v. Swain*, this Court examined whether prison officials used

21 excessive force when they restrained a prisoner expressing suicidal ideations to a restraining bed

22 for over twelve hours. *Troupe v. Swain*, No. 3:16-cv-05380-RJB-DWC, 2017 WL 2427745, at *4

23 (W.D. Wash. May 11, 2017), *report and recommendation adopted*, 2017 WL 2423774 (W.D.

24

1    Wash. June 5, 2017). The Court looked to the following circumstances before concluding the

2    restraint did not constitute excessive force. First, the officials reasonably perceived a threat to the

3    prisoner's safety due to his prior suicidal ideations, his history of having dangerous contraband,

4    and his disruptive behavior leading up to the restraint. *Id.* at *1, 4–5. Next, the inmate complied

5    with instructions during the restraint and was placed in the restraining bed without incident and

6    with no more than *de minimis* application of force. *Id.* at *4. The Court noted that several

7    measures were taken to prevent unnecessary discomfort during the restraint. Video footage of the

8    restraint process showed officers taking care to check the restraints to make sure the prisoner did

9    not experience any unnecessary pain. *Id.* at *4. And, during the twelve hours he spent in the

10   restraining bed, the prisoner was periodically checked on by officers and nurses. *Id.* He was also

11   given opportunities to stretch his limbs and torso. *Id.* Lastly, prison officials concluded the

12   restraining bed would be a more comfortable means of restraint during nighttime hours; the

13   Court found this conclusion reasonable, even though applicable policies advised use of a

14   restraining chair before resorting to a restraining bed. *Id.* at *1.

15        This case more closely resembles the restraint in *Troupe* than the restraint in *Young*. First,

16   unlike the prisoner in *Young* and similar to the prisoner in *Troupe*, Plaintiff engaged in

17   destructive behaviors and had been found with dangerous contraband twice in hours leading up

18   to the restraint. Significantly, Plaintiff obtained both dangerous items (the caulking and loosened

19   screw) from inside his cell. Dkt. 31 at 4 (Ohlson Declaration, ¶ 17); Dkt. 25-2 at 57 (Incident

20   Report). Therefore, Defendant Delong reasonably believed Plaintiff posed a risk of harm to

21   himself and restraints were necessary to abate that risk.

22        Next, like the prisoners in both *Young* and *Troupe*¸ Plaintiff was placed in the restraining

23   chair without incident and with no more than *de minimis* force. However, unlike the prisoner in

24

*Young*, there is no evidence Plaintiff experienced unnecessary pain during the restraint. Rather, more like the prisoner in *Troupe*, the evidence demonstrates numerous measures were taken to ensure Plaintiff did not suffer unnecessarily. Video footage reflects officers taking care when securing Plaintiff in the restraining chair. Second Restraint Video, at 00:00–05:08. After he was secured in the chair, Defendant Delong made sure a nurse verified the safety of Plaintiff's restraints. *Id.* at 05:32–06:33. During the two and a half hours he was in the restraining chair, the Close Observation Log reveals that officers and nurses periodically checked Plaintiff's restraints and the temperature in his cell. Dkt. 25-2 at 30 (entries at 11:47 a.m., 12:07 p.m., 12:20 p.m., and 12:30 p.m.). Following one of those checks, Nurse Riojas applied bandages to Plaintiff's wrist because the straps had opened an old wound. *Id.* (entries at 11:52 a.m. and 12:10 p.m.). This evidence suggests CBCC staff members were not simply going through the motions of checking the restraints but rather taking care to prevent Plaintiff from suffering any unnecessary discomfort during his restraint.

Finally, like the prisoners in both *Young* and *Troupe*, the Second Restraint did not fully comply with applicable policy, which limits use of the retraining chair to two hours. *See* DOC Policy 420.250 (restricted). Even so, Plaintiff has not pointed to any evidence to show the additional 30-minutes Plaintiff remained in the restraining chair was the result of malicious intent by Defendant DeLong to cause him harm. And, unlike in *Young*, there is no evidence Plaintiff was injured because he was left in the restraining chair thirty minutes longer than set forth by DOC policy. Absent evidence the restraining chair was used without legitimate purpose or in a manner that caused Plaintiff unnecessary pain, the failure to remove Plaintiff from the restraining chair within the two hours required by DOC policy is insufficient to show excessive

1   force. Thus, Plaintiff has failed to create a genuine issue of material fact as to whether the force

2   used during the Second Restraint was excessive.

3        Plaintiff urges a different result, centering much of his argument on the different physical

4   and psychological injuries he suffered from the restraints. But Plaintiff does not support his

5   arguments with sufficient evidence of injury to create a triable issue as to the amount of force

6   used during the Second Restraint; rather, Plaintiff submits only the following statement from his

7   sworn declaration:

8        As a result of these incidents involving officers at CBCC, I have experienced
         physical pain, humiliation, intense emotional distress and anger, hunger and a
9        worsening of my symptoms, leading to an increase in my post-traumatic stress
         disorder symptoms, anxiety, my borderline personality disorder symptoms, and
10       depressive symptoms.

11  Dkt. 31 at 5 (Ohlson Declaration, ¶ 20).[6] Plaintiff submitted no medical evidence showing he

12  suffered physical injuries or exacerbation of his mental health symptoms following his time in

13  the restraining chair. There is also no evidence showing he sought medical attention for any

14  physical pain or mental distress following the Second Restraint. In short, Plaintiff's vague

15  statement, without more, is insufficient to create a genuine issue of material fact and avoid

16  summary judgment on this claim. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993)

17  ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it

18  cannot rely on conclusory allegations unsupported by factual data to create an issue of material

19  fact.").

20       Accordingly, the undersigned recommends summary judgment be granted in favor of

21  Defendant Delong on Plaintiff's excessive force claim based on the Second Restraint.

22  _____

23       [6] As will be discussed in greater detail below, Plaintiff also states being nude in front of other men was
    "extremely distressing" and brought up memories of "past sexual trauma and emotional abuse" *Id.* at 2–3. The
24  emotional harm allegedly caused by Plaintiff's forced nudity is assessed under his deliberate indifference claim.

**C. Deliberate Indifference Claim**

For his second Eighth Amendment claim, Plaintiff complains Defendant Delong exhibited deliberate indifference regarding Plaintiff's prolonged nudity during the First and Second Restraint. Dkt. 29 at 9–10. Plaintiff also briefly references Defendant Delong's deliberate indifference through other means. *Id.* at 7–10. The Court will address each in turn.

1. Prolonged Nudity

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane prisons. *Farmer v. Brennan*, 511 U.S. 825, 832 (1970). Prison officials are required to provide prisoners with basic life necessities, such as food, clothing, shelter, sanitation, medical care, and personal safety. *Id.*; *Toussaint v. McCarthy*, 801 F.3d 1080, 1107 (9th Cir. 1986). To establish an Eighth Amendment claim based on deprivation of one of these conditions, an inmate must prove both an objective and subjective element. Objectively, a defendant's acts or omissions must deprive the inmate of "the minimal civilized measure of life's necessities" and, subjectively, a defendant must have acted with "deliberate indifference" to an excessive risk to inmate health or safety. *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994) (quoting *Farmer*, 511 U.S. at 834); *see Estate of Ford v. Ramirez—Palmer*, 301 F.3d 1043, 1049–50 (9th Cir. 2002). In evaluating deliberate indifference claims, courts must consider the "circumstances, nature, and duration of a deprivation…in determining whether a constitutional violation has occurred." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

Defendants argue they are entitled to summary judgment on this claim because Plaintiff has not shown there was an excessive risk to his health or safety. *See* Dkt. 35. The Court agrees summary judgment is appropriate.

First, Plaintiff's evidence on this point is his statement it was "extremely distressing" to be nude in front of other men because it brought up memories of "past sexual trauma and

emotional abuse." Dkt. 31 at 2–3 (Ohlson Declaration, ¶ 10). This lone statement is not enough to satisfy the objective component of a deliberate indifference claim. *See Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004) (affirming summary judgment on deliberate indifference claim where plaintiff submitted no medical evidence showing correction's officers conduct exacerbated his mental health condition); *Parker v. Stevenson*, 625 F. App'x 196, 200 (4th Cir. 2015) (concluding a "one line allegation" that a prisoner "suffered mental and emotional problem [was] insufficient to demonstrate a serious or significant emotional injury adequate to survive summary judgment"); *c.f. Jordan v. Gardner*, 986 F.2d 1521, 1523 (9th Cir. 1993) (evidence showing severe risk of psychological harm from cross-gender searches included, among other things, expert testimony regarding the impact of male officers searching women who suffered from PTSD due to prior sexual abuse).

Second, Plaintiff fails to submit evidence demonstrating Defendant Delong was personally aware of any severe risk of psychological harm posed by Plaintiff's nudity in front of male officers. *See Austin*, 367 F.3d at 1172; *c.f. Jordan*, 986 F.2d at 1523 (evidence showing subjective awareness of severe risk of psychological harm caused by cross-gender searches included warnings from staff psychologists and prior negative response from one female inmate who "had to have her fingers pried loose from bars she had grabbed during the search" and "vomited after returning to her cell block").

Third, any argument that Defendant Delong acted with indifference to Plaintiff's nudity is undermined by the video footage showing white privacy screens surrounding Plaintiff during both Restraints. *See* First Restraint Video I and Second Restraint Video. Although these screens did not prevent the officers immediately surrounding Plaintiff from seeing him, the screens did shield Plaintiff from the view of other inmates and extraneous staff members. *Id.*

1    Therefore, the Court finds Plaintiff has failed to create a genuine issue of material fact as

2    to whether Defendant Delong was deliberately indifferent to any severe risk of harm posed by

3    his nudity.

4        2.    <u>Other References to Deliberate Indifference</u>

5    Next, interlaced with his arguments about excessive force, Plaintiff briefly argues

6    Defendant Delong exhibited deliberate indifference by directing use of the EID shield and the

7    restraining chair. Dkt. 29 at 9–10. Plaintiff was given the opportunity to clarify the scope of his

8    deliberate indifference claims in supplemental briefing but did not do so. Dkts. 34, 37. Thus, the

9    Court finds Plaintiff is not pursing his deliberate indifference claim based on use of the EID shield

10   or the restraining chair. *See also Farmer*, 511 U.S. at 835 (noting that generally "[a]pplication of

11   the deliberate indifference standard is inappropriate… when officials stand accused of using

12   excessive physical force."). Even if Plaintiff had clarified his deliberate indifference claim to

13   include use of the EID shield and the restraining chair, he has submitted no evidence regarding

14   the risk of significant injury posed by either of these applications of force. *C.f. Mohamad v.

15   Barone*, 494 F. App'x 212, 214 (3d Cir. 2012) (granting summary judgment on deliberate

16   indifference claim based on 24-hour naked restraint in restraining chair because plaintiff did not

17   provide evidence linking his mental health condition to his restraint, nor did he provide evidence

18   of risk to his physical health or safety); *see also Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946,

19   952 (9th Cir. 1978) ("[L]egal memoranda and oral argument are not evidence, and they cannot

20   by themselves create a factual dispute sufficient to defeat a summary judgment motion.").

21   In his Complaint, Plaintiff alleges Defendant Delong was deliberately indifferent

22   regarding use of the spit mask. Dkt. 1-1 at 5–6. However, Plaintiff submits no evidence showing

23   Defendant Delong directed, or was otherwise personally involved in, the use of the spit mask. He

24

1  also fails to show he was at risk of significant injury for the 2-minutes the spit mask was on his

2  face.

3       Finally, for the first time in his response in opposition to summary judgment, Plaintiff

4  makes references to the denial of food as grounds for his deliberate indifference claim. Dkt. 29 at

5  7, 9. However, there is no mention of food deprivation in his Compliant. Dkt. 1-1. Thus,

6  Plaintiff's references to food deprivation are not properly before the Court and are no reason for

7  denying summary judgment on his deliberate indifference claim. *See Navajo Nation*, 535 F.3d at

8  1080. Accordingly, the undersigned recommends summary judgment be granted on Plaintiff's

9  deliberate indifference claim.

10  **D.  IIED Claim**

11       Finally, Plaintiff argues Defendant Delong's conduct during both restraints makes him

12  liable for IIED under Washington State law. Dkt. 29 at 22–25. In Washington, the elements of

13  the tort of IIED are (1) extreme and outrageous conduct, (2) intentional or reckless infliction of

14  emotional distress, and (3) the claimant actually suffers severe emotional distress. *Kloepfel v.*

15  *Bokor*, 149 Wash.2d 192, 195, 66 P.3d 630 (2003). "The law intervenes only where the distress

16  inflicted is so severe that no reasonable person could be expected to endure it." *See Saldivar v.*

17  *Momah*, 145 Wash. App. 365, 390 (2008). As explained with his excessive force and deliberate

18  indifference claims, Plaintiff has failed to submit sufficient evidence showing he suffered severe

19  emotional distress caused by Defendant Delong. *See supra*. Accordingly, the undersigned

20  recommends summary judgment be granted in favor of all Defendants on Plaintiff's IIED claim.

21  **E.  Unnamed Defendants**

22       "As a general rule, the use of 'John Doe' to identify a defendant is not favored."

23  *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). However, when the identify of a

24  defendant is unknown to a plaintiff before he files suit, "the plaintiff should be given an

1    opportunity through discovery to identify the unknown defendants, unless it is clear that

2    discovery would not uncover the identities, or that the complaint would be dismissed on other

3    grounds." *Gillespie*, 629 F.2d at 642. When a plaintiff fails to timely identify or serve unnamed

4    defendants, district court have discretion to dismiss claims against those defendants. *Ouma v.*

5    *Clackamas Cnty.*, 663 F. App'x 544, 545 (9th Cir. 2016).

6           Here, Plaintiff listed ten "Doe," or unnamed, Defendants in his Complaint. Dkt. 1-1.

7    Plaintiff had the opportunity to identify these Defendants through discovery and did not seek to

8    amend the Complaint. While Defendants did not seek to have the "Doe" Defendants dismissed

9    based on the claims that remain, the Court *sua sponte* recommends dismissal of "Doe"

10   Defendants.

11          **F.  Supplemental Jurisdiction**

12          In addition to his federal § 1983 claims and his state law IIED claim, Plaintiff asserts

13   state claims for negligent supervision and training and general negligence. Dkt. 1-1. Defendants

14   did not move for summary judgment on these claims nor have the parties briefed whether the

15   Court should retain supplemental jurisdiction if the federal claims are dismissed. However, as

16   this Court recommends the federal claims be dismissed, the Court will analyze supplemental

17   jurisdiction should be exercised over the remaining state law claims.

18          A district court may exercise supplemental jurisdiction over state law claims arising from

19   the same set of operative facts that supports a federal claim. *See Carlsbad Tech., Inc. v. HIF Bio*,

20   Inc., 556 U.S. 635, 639–40 (2009) (citing 28 U.S.C. §§ 1367(a), (c)); *Artis v. District of*

21   *Columbia*, 583 U.S. 71 (2018). However, "[w]hen district courts dismiss all claims

22   independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well

23   all related state claims." *Artis*, 583 U.S. at 74. *See also Acri v. Varian Assocs.*, Inc., 114 F.3d

24   999, 1001 (9th Cir. 1997) (suggesting that a district court may, but need not, decide *sua sponte*

1    whether to continue exercising supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) once all

2    federal law claims have been dismissed).

3        As stated above, the undersigned finds Plaintiff has failed to establish his federal claims

4    and recommends dismissal of those claims on summary judgment. Plaintiff's remaining claims

5    raise issues solely of state law, and the state courts will therefore be more familiar with the law

6    governing these claims. As there are no federal claims remaining, the Court finds it appropriate

7    to decline the exercise of supplemental jurisdiction over the remaining state law claims.

8        In a removed case in which a federal court declines to exercise supplemental jurisdiction,

9    the court may either dismiss the state law claims without prejudice or remand them to state court.

10    *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 357 (1988). Here, the interests of judicial

11    economy, convenience, fairness, and comity support remand to state court, rather than dismissal.

12        Accordingly, the undersigned recommends Plaintiff's state law negligent supervision and

13    training claim and his general negligence claim be remanded to the Superior Court of

14    Washington for Thurston County.

15                    **V.    CONCLUSION**

16        For the reasons set forth above, the undersigned recommends Defendants' Partial Motion

17    for Summary Judgment (Dkt. 25) be granted and summary judgment be entered in favor of

18    Defendants State of Washington, Washington State Department of Corrections, and Thomas

19    Delong on Plaintiff's § 1983 claims and state law IIED claim. It is further recommended

20    Plaintiff's § 1983 claims and all other claims against the ten unidentified "Doe" Defendants be

21    dismissed. Finally, the undersigned recommends the Court decline supplemental jurisdiction

22    over Plaintiff's remaining state law claims (negligent supervision and training and general

23

24

negligence) and this matter be remanded to the Superior Court of Washington for Thurston County.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on June 10, 2024, as noted in the caption.

Dated this 24th day of May, 2024.

David W. Christel
United States Magistrate Judge